STATE of Missouri, Respondent,

v.

Gerald SMITH, Appellant.

No. 63338.

Supreme Court of Missouri,
En Banc.

April 26, 1983.

Rehearing Denied May 17, 1983.

418

John Putzel, Asst. Public Defender, St. Louis, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Chief Justice.

Defendant appeals from conviction by jury of capital murder, § 565.001, RSMo 1978,[1] and a sentence of death. Direct appeal to this Court lies for consideration of the punishment assessed, as well as errors alleged on appeal. Section 565.014; Art. V, § 3, Mo. Const. (1945, as amended 1982).

As error defendant asserts: (1) unconstitutional discrimination in the grand jury selection process; (2) improper overruling of his challenge for cause of two veniremen; (3) improper refusal to allow his attorney to inquire of veniremen whether any believed that a death sentence, if assessed, would be carried out; (4) improper refusal to instruct jury that in order to impose death penalty, they must find aggravating circumstances were not outweighed by mitigating circumstances beyond a reasonable doubt; (5) improper instruction of jury on defense of mental disease or defect; (6) facial invalidity of the death penalty statute; (7) impermissible vagueness of applicable statutory aggravating circumstances and insufficiency of evidence to support imposition of death penalty and (8) excessiveness and disproportionateness of death penalty, considering the crime and the defendant.

From the substantial evidence adduced supportive of the verdict, the jury could reasonably have found the following: At approximately 8:00 p.m. on September 8, 1980, defendant and Dana Osia, a girl he had known about four years and had been dating for a week, went driving in Dana's car. After an hour or so, defendant announced his intention to visit a person whom he said was his cousin. Defendant told Dana he was going to hurt this person because she had once given him "the clap." At approximately 9:30 p.m., defendant and Dana drove to the home of Karen Roberts, where defendant invited Karen to take a ride. Initially she refused, but defendant

persuaded her to go. After driving about for another hour or so, the three stopped near defendant's house and talked for awhile. During the conversation, defendant asked Dana four times to go home, and Dana finally agreed. Although Dana offered to drive Karen home, Karen was persuaded to stay by defendant, and Dana left alone.

Sometime after Dana's departure, defendant left his house with Karen Roberts to walk her home. According to defendant's subsequent confession, during the walk they argued as to whether she had given him venereal disease. At one point, Karen cursed him and defendant pushed her to the ground. When she got up, Karen was holding a heavy metal bar which she swung at the defendant. Defendant blocked the blow and jerked the bar away; when Karen started to run, defendant gave chase. Carrying the metal bar, defendant chased Karen Roberts across the street, north for half a block, east for half a block to some railroad tracks, north along the tracks for a full block and across another street, where he finally caught her. There, defendant bludgeoned Karen to death with the metal bar. An autopsy on the body of Karen Roberts revealed massive head injuries. The back of her skull was caved in; she suffered six head lacerations, skull fractures "too numerous to count," and multiple contusions and bruises of the brain beneath the skull. These injuries were consistent with multiple blows, inflicted with the heavy iron bar identified as the murder weapon. Any one of the blows could have rendered Karen unconscious or caused her death. Karen also suffered abrasions on her face and contusions of the shoulder, arm, hip and thigh. On a scale of "one to ten," an expert witness rated the seriousness of Karen's injuries at "eight."

Dana next saw defendant on the evening of September 9, 1980, when she, defendant and defendant's brother, Eugene, went driving. At one point, Eugene left the car to go into a liquor store, and defendant told

1. Unless otherwise indicated, statutory refer- ences are to RSMo 1978.

Dana he had killed the girl they picked up the night before, which was why he had wanted her to leave. When Dana did not believe he had committed a murder, defendant showed her a newspaper story about the killing. Nine days later, defendant was arrested. After receiving *Miranda* warnings and executing a waiver, defendant initially denied the murder but later admitted, "I killed the bitch" and gave a detailed statement of the events described above. Defendant also accompanied police officers to the murder scene, where he assisted in locating and identifying the iron bar he used to kill Karen Roberts. The bar was approximately 18½ inches long and weighed about eight pounds. Defendant was charged with capital murder.

On January 30, 1981, four months before trial, state's witness Dana Osia received the following letter addressed to her but unsigned and written on a paper bag:

Dana you are as good as dead if you show in Court on my partner Jerry Smith. You might just die anyway unless you tell them you was lying in Court.

The defense stipulated this letter was written by defendant. On March 14, 1981, another letter handwritten by defendant was received by a St. Louis newspaper, the St. Louis Globe-Democrat:

You people wrote the story on me back in September all wrong. So I am giving you the real story.

I Gerald Smith killed Karen Roberts. I have been looking for her for 4 months so I could kill her. On September the 8 1980 I finally got my chance to kill her and I done just that. I had a gun on me at the time but I thought shooting her would be to damn good for her. I wanted her to feel some pain so I beat her little lousy head in. If she were living now I would do it all over to her again. She gave me a dose of the clap back in April 1980, and because of that my feeancee Joyce Dodson left me over it. I planned on killing her ever since.

 Gerald Smith

 the cold blooded killer

Defendant did not testify but admitted through counsel that he killed Karen Roberts. He called two witnesses, a psychiatrist and psychologist, to advance a theory of diminished capacity and assertion that the act at most constituted second degree murder. After considering the evidence, arguments and instructions, the jury found defendant guilty of capital murder. At the punishment phase of the trial, the state introduced no additional evidence, but the defense called a City Jail chaplain, defendant's mother, and his former girl friend to argue against the death penalty. The jury returned a sentence of death, which was imposed by the court.

Defendant is a white male with an eighth grade education. At the time of the murder he was 21 years old.

### I.

■ Defendant contends the trial court erred in overruling the motion to quash his indictment because the process of grand jury selection in the City of St. Louis denied him equal protection of the laws and his right to a grand jury representing a fair cross-section of the community. Defendant was indicted by the August, 1980 term of the Grand Jury, and his motion to quash was consolidated with 140 others containing the same allegations regarding the same grand jury. The contention raised here was briefed, argued and overruled in *State v. Baker*, 636 S.W.2d 902, 907–10 (Mo. banc 1982)ˑand *State v. Payne*, 639 S.W.2d 597, 598–99 (Mo. banc 1982), appeals involving other consolidated defendants. Defendant concedes our holding in *Payne* controls here, and the contention is denied.

### II.

It is next asserted the court erred in overruling defendant's challenges for cause of two veniremen, neither of whom served on the jury.

■ The principles governing jury selection in this state are well established. Among others is the right of the criminal accused to fair and impartial jurors who

will follow the law. To protect the defendant's right to a jury free from objectively demonstrated and subjectively sensed partiality, he must be afforded a full panel of qualified veniremen from which to make his allotted peremptory challenges, *State v. Engleman,* 634 S.W.2d 466, 471 (Mo.1982); *State v. Thompson,* 541 S.W.2d 16, 17 (Mo. App.1976). While trial court refusal to sustain a valid challenge for cause constitutes reversible error, *State v. Engleman,* 634 S.W.2d at 471, it is well established that the trial court has wide discretion in determining the qualifications of a venireman, and its decision thereon will not be disturbed absent a clear abuse of discretion and real probability of injury to the complaining party. *State v. Betts,* 642 S.W.2d 604 (Mo. banc 1982). A clear line cannot be drawn for all cases as to when a challenge for cause should be sustained; there will be instances in which an appellate court might have done differently but cannot say there was an abuse of discretion; each case must be judged on its particular facts; a determination by the trial judge of the qualifications of a prospective juror necessarily involves a judgment based on observation of his demeanor and, considering that observation, an evaluation and interpretation of the answers as they relate to whether the venireman would be fair and impartial if chosen as a juror. *State v. Cuckovich,* 485 S.W.2d 16, 22–23, (Mo. banc 1972). Because the trial judge is better positioned to make that determination than are we from the cold record, doubts as to the trial court's findings will be resolved in its favor. *State v. Engleman,* 634 S.W.2d at 472.

Defendant contends the court erred in denying his motion to strike for cause Venireman Moss, because the testimony showed "he would likely give greater weight to the testimony of a police officer purely by virtue of his status as a police officer." Voir dire of Mr. Moss included the following:

MR. BAUER [PROSECUTOR]: ... [Y]ou may recall as I read the list of witnesses, quite a few of them were police officers. And everyone of us probably at sometime in our lives has some experience with police officers; whether it's receiving a speeding ticket or being helped out in a time of need or whatever. The question is that when these officers take the stand they are like any other witness. Do any of you feel that if you listen to the testimony of a police officer, for whatever reason, you feel that you would give it more weight or credibility or less weight and credibility than any other witness? Or would you be able to treat their credibility and the weight of their testimony as you would any other witness? Any of you have any problem?

VENIREMAN MOSS: I think I might lean more towards a police officer's testimony.

MR. BAUER: All right. You understand that the police officers are like any other witness, basically?

VENIREMAN MOSS: Well my brother is a police officer.

MR. BAUER: You think that that would have an effect on you?

VENIREMAN MOSS: It's hard to say, it might. I don't know.

MR. BAUER: The duty of a jury, as I mentioned, is to listen to the evidence and return a verdict based on that evidence. I could probably stand here for another ten hours and not get to know you as well as I would like. Unfortunately, we don't have that kind of time. Is there anything you can think of about yourselves that you think might affect your ability to sit and listen and return a verdict in this case and be a fair juror to the defendant as well as to the State? Anybody think you would have any problems along those lines? Okay, Fine....

Defendant's attorney later made the following inquiry:

MR. PUTZEL [DEFENSE COUNSEL]: ... Mr. Moss you said what, your brother-in-law is a police officer?

VENIREMAN MOSS: No my brother is, in Virginia.

MR. PUTZEL: Your brother?

VENIREMAN MOSS: My brother is.

MR. PUTZEL: Has he ever been a police officer in this City?

VENIREMAN MOSS: No he has never lived here.

MR. PUTZEL: Do you think that the fact that your brother is a police officer would influence the way you view a police officer's testimony? You indicated earlier you thought you might tend to lean towards believing or lean toward the police officer. Can you elaborate?

VENIREMAN MOSS: Yeah. My feeling is that I don't feel the police would be lying. I'm not trying to imply some other witness might be, or bending the truth, but that's all. I don't think the fact my brother is a police officer would itself really effect [sic] me.

MR. PUTZEL: It's your general feeling, without saying other witnesses would be lying, that you would be what, less likely to be critical of a police officer's testimony or less likely—

VENIREMAN MOSS: I think I would have less doubts about the validity of his testimony.

MR. PUTZEL: Well you understand that there will probably be a fair number of police officers testifying in this case?

VENIREMAN MOSS: Um-hum.

MR. PUTZEL: Okay. Do you think, then, that that might present you with some difficulty with respect to being fair to my client, since you would start out at least giving the police officers a little bit of an edge as far as believing their testimony?

VENIREMAN MOSS: It's hard to say. Just what I said before, is that I think I would have less reason to doubt the validity of a police officer's testimony, okay? I mean, I don't see that they have anything—

MR. PUTZEL: Any motive to shade the truth?

VENIREMAN MOSS: Yeah, I think they're just doing their job.

MR. PUTZEL: Well, if in fact the police officer's testimony were damaging from my client's point of view, do you think, then, that might cause you to be unfair to him?

VENIREMAN MOSS: No, because I would have to listen to what the other people were saying. I assume there are—I don't know if assume is the right word—but since their, the investigations and whatever else was involved in this case, I guess I have to say I assume their testimony would be damaging to your client, all right?

MR. PUTZEL: All right. That's a safe bet, police officers are obviously engaged in the business of arresting people who commit violations of the law. Okay.

After defense counsel concluded his questions to the panel, the Court addressed Venireman Moss:

THE COURT: Mr. Moss, there is one thing I want to get straight about some of the questions you were asked in connection with police officers.

I took it from what you said a moment ago that you have the feeling that there would be less reason for police officers to lie than perhaps some other person. But do you realize as a juror you have to make that determination as to the believability or the credibility of each and every witness who testifies depending upon the facts in this case? And would you be able to do that with regard to police officers as well, and treat them in no different fashion than any other witness from the standpoint of making that determination?

VENIREMAN MOSS: Yeah.

THE COURT: All right.

Defense counsel's motion to strike Venireman Moss for cause was overruled.

■ There is ample support in this record for the trial court's finding that Venireman Moss could be a fair and impartial juror. Mr. Moss's initial statement that he "might lean more towards a police officer's testimony" raised a *possibility* that his brother's occupation would affect his ability to fairly evaluate police testimony. After further reflection, however, Moss stated he didn't think his brother's position would affect his judgment. Viewed in the light most favorable to the trial court's finding, the testimony as a whole indicated that in evaluating

the credibility of any witness, Moss would consider the witness's motive to lie. It was Mr. Moss's expressed opinion that a policeman, as a policeman, would have less motive to lie than other *possible* witnesses. As a hypothetical generalization, we find no disqualifying bias in this statement. Mr. Moss clearly said he did not assume any witness would lie. When asked specifically whether damaging police testimony might cause him to be unfair to the defendant, Mr. Moss unequivocally answered "No," and said that his ultimate determination would depend on what all the witnesses had to say. In response to the court's inquiry, Mr. Moss said he would be able to determine the credibility of each witness depending on the facts of the case and treat policemen no differently than any other witness in making that determination. From this and the trial court's opportunity to view the demeanor of the witness and hear his testimony, we find no abuse of discretion by the trial court.

Although not essential to our determination, it is noteworthy that the credibility of police officers was not a significant issue in this case. Six of the twelve state witnesses were police officers, but none testified to an issue truly contested in the case. One police witness described finding the body; another described the scene where the body was discovered; a third identified the iron bar alleged to be the murder weapon; two policemen described arresting the defendant, his waiver of rights and oral confession, and his assistance in locating the murder weapon; the sixth police witness described defendant's first admission that he killed Karen Roberts. Defendant did not contest these facts. Through counsel, he admitted killing Karen Roberts and his confession to police officers. There was no argument his confession did not occur as described or that events did not occur as confessed. Defense counsel argued the confessed facts were more consistent with a finding of diminished capacity than of capital murder. The major issue at defendant's trial was his mental state, an issue upon which police testimony shed very little light. The relevant evidence was provided by Dana Osia, defendant's own letters, the psychologist and the psychiatrist. These facts strengthen our conviction that the trial court did not err in finding Venireman Moss qualified to serve as a fair and impartial juror.

Defendant also contends the court erred in overruling his challenge for cause of Venireman Kraft. Voir dire of Mr. Kraft included the following:

MR. PUTZEL: Now again, all of you have indicated as you sat here so far you can consider the death penalty in a case. I want to ask this question: Do any of you think that the death penalty ought to be automatic in a case of Capital Murder; so that if some one is convicted of the crime of Capital Murder the only punishment available ought to be capital punishment or death in the gas chamber? Do any of you feel that way?

VENIREMAN KRAFT: If found guilty after listening to the testimony, I do.

MR. PUTZEL: You think it should be automatic?

VENIREMAN KRAFT: (Shaking head.)

MR. PUTZEL: Would it be your statement, then, Mr. Kraft, that if you deliberated on the jury and if you found Jerry Smith guilty of Capital Murder, that you would automatically vote for the death penalty?

VENIREMAN KRAFT: Yes, sir.

MR. PUTZEL: Thank you Mr. Kraft, I appreciate your honesty.

MR. BAUER: Mr. Kraft you indicated in answer to a question by Mr. Putzel concerning the death penalty, I believe you indicated, that you're in favor of the death penalty.

VENIREMAN KRAFT: Yes, sir.

MR. BAUER: All right. Do you feel that if the Court instructs you that there are two alternatives for this case; that after you listen to the evidence you will be able to consider both the death penalty and the life in prison with no probation or parole for fifty years, and make your

determination considering both of them as alternatives?

VENIREMAN KRAFT: Possibly, yes.

MR. BAUER: All right. So what you're saying, then, is although you favor the death penalty you would be able to consider both alternatives?

VENIREMAN KRAFT: Yes, sir, depending on the testimony.

MR. BAUER: Depending on what you hear and you at this time have no idea what the testimony is going to be.

VENIREMAN KRAFT: Okay, yes.

MR. BAUER: Okay fine.

THE COURT: Mr. Kraft we might as well explore that because those who are selected as jurors will take an oath to follow the law of this State. And in this case with regard to that point, the Court will undoubtedly give an instruction to the jury to the effect that you may not return a death penalty verdict, even though you have found a party guilty of Capital Murder, unless you find some aggravating circumstance; and if you do not find an aggravating circumstance then the verdict must be life in prison without possibility of probation or parole for fifty years. Would you have any difficulty in following such an instruction, Mr. Kraft?

VENIREMAN KRAFT: No, sir. Like I say, it would depend on the testimony.

THE COURT: That's fine, that's fine. Thank you sir.

Defense counsel's motion to strike venireman Kraft for cause was denied. Defendant argues this was error because "[Mr. Kraft] said that upon a finding of guilty of capital murder he would automatically impose the death penalty," indicating he could not "follow the law and consider the full range of punishment after a finding of guilt and further deliberation on aggravating and mitigating circumstances."

 The defendant has a right to jurors who will follow the law. *State v. Brown*, 547 S.W.2d 797, 799 (Mo. banc 1977). Section 565.012, RSMo Cum.Supp.1982, requires the jury in a capital murder case for which the death penalty is authorized to consider both aggravating and mitigating circumstances in determining the penalty imposed. Section 565.008 mandates a sentence of life imprisonment if the jury does not recommend imposition of the death penalty. Implicit in these statutes is a requirement that juries in cases such as this consider the appropriateness of life as well as death sentences, and a juror who would automatically vote to impose a sentence of death upon a finding of guilt regardless of circumstances may be challenged for cause. However, we find a fair reading of the record in this case supports the trial court's conclusion that venireman Kraft would follow the court's instructions and consider both penalties authorized for capital murder.

 The first pertinent defense question was whether the potential jurors thought "the death penalty *ought* to be automatic in a case of capital murder; so that if someone is convicted of the crime of capital murder the only punishment available *ought* to be capital punishment or death in the gas chamber." (Emphasis added.) Venireman Kraft was then specifically asked whether he thought "[capital punishment or death in the gas chamber] *should* be automatic." (Emphasis added.) Directly following these two questions came the query, "[w]ould it be your statement, then, Mr. Kraft, that if you deliberated on the jury and if you found Jerry Smith guilty of Capital Murder, that you *would* automatically vote for the death penalty?" Reviewed in context, venireman Kraft's affirmative answer to this question does not constitute an unambiguous assertion that he would not follow the court's instructions if directed the law required consideration of life imprisonment as well as capital punishment. No alternative to capital punishment was mentioned in defense counsel's preceding questions, and it is reasonable to infer that venireman Kraft was responding in the hypothetical vein established in the two previous questions. Further, the qualifications of a prospective juror are not determined conclusively by a single response but are made on the basis of the entire

examination, *State v. Garrett,* 627 S.W.2d 635, 642 (Mo. banc 1982), and Mr. Kraft's subsequent testimony indicated he would not automatically sentence to death persons convicted of capital murder if he were instructed to do otherwise. Upon inquiry he told the State's attorney and the court he would be able to consider both punishment alternatives. Defendant argues Mr. Kraft's answers, "[p]ossibly, yes," "[o]kay, yes," and "depending on the testimony" were equivocal, but we are not bound to adopt the interpretation defendant urges in the face of other reasonable constructions. It is reasonable to interpret "[p]ossibly, yes" as an abandonment of the equivocal in favor of a positive response and "[o]kay, yes" as an understanding of the question followed by an affirmative response. It is also reasonable to infer the statement "it would depend on the testimony," referred to the sentence Mr. Kraft would favor in a given case, not his ability to consider both punishments.

■ Defendant also argues that venireman Kraft's response to the inquiry of the court did not indicate willingness to consider the punishment of life imprisonment even if an aggravating circumstance was found, but only ability to follow an instruction that capital punishment could not be imposed unless an aggravating circumstance was found. Defendant cites the case of *Smith v. State,* 573 S.W.2d 763 (Tex.Cr. App.1977), in which the Texas Court of Criminal Appeals said:

> 2. In *Smith v. State,* 573 S.W.2d 763 (Tex.Cr. App.1977), the challenged venireman explicitly stated he would not consider the punishment of life imprisonment if appellant were found guilty of capital murder:
> Q. Then, you really wouldn't consider life— you wouldn't even consider it?
> A. That's right.
> *Id.* at 764. At several other points, the venireman expressed his belief that death should be the penalty for taking a life:
> ... I feel very strongly if a person, after pushing to take somebody's life, he should— give his life.
> [If] a person actually took another person's life then he should ... give his life for another person's life.
> I've always felt that way about it I feel that if somebody knowingly takes some[one]

[A] juror's willingness to demand of the state that it prove each question submitted pursuant to Art. 37.071 [one of which was equivalent to an aggravating circumstance] beyond a reasonable doubt is not equivalent to an assertion that the juror will consider the full range of punishment for the offense in question.

*Id.* at 765.

*Smith v. State,* supra, however, is factually distinguishable from this case. In *Smith,* "[t]he *overall picture* presented by the voir dire examination of ... [the venireman] is one of a person holding strong convictions that death is the only punishment he could consider for a person guilty of capital murder, and that life imprisonment is not an adequate punishment and would not be considered." [2] 573 S.W.2d at 765 (Emphasis added). Such is not the case here. In overruling defense counsel's motion to strike venireman Kraft for cause, the trial court said:

> ... I think his response to your question [that he would automatically vote for the death penalty if he found defendant guilty of capital murder], ... really, was because he didn't understand what the law would require of him. Once that was pointed out to him, I think he indicated he would at least give consideration ....
> I'm going to overrule the Motion to strike him.

Giving due regard to the trial court's opportunity to view the demeanor of the witness

> else's life ... then they should be willing to forfeit theirs.
> *Id.* at 764–65. The venireman also stated his view that death would be the only proper punishment was a firm conviction and that he could not be swayed or persuaded from that position. When asked whether he could consider a punishment of life imprisonment, he said that they are turned loose too quickly and that murderers who are given a life sentence are "back on the streets in a few years and [do] it all over again." *Id.* at 765.
> In contrast to these earlier statements demonstrating an unwillingness to consider life imprisonment, the venireman's answers to questions asked by the court in an effort to rehabilitate him were equivocal and ambiguous. *Id.*

and hear his testimony, our review of the record discloses no abuse of discretion.

Defendant also contends the court erred in overruling his motion to strike venireman Kraft for cause, because "[Mr. Kraft said he] had a daughter who was raped at the same age at which the victim was murdered [and] ... indicated that this would affect his ability to be impartial." The pertinent testimony was as follows:

> MR. PUTZEL: Have any of you ever been the victim of an assaultive type of crime? And by that I mean armed robbery and assault where they—someone tried to hurt you physically or did hurt you physically and that you would include, among that; have you yourself or any close friends or relatives been the victims of such crimes, I would include among those, rape and sexual offenses of all sorts or sexual assaults. Are there any responses to that question?
>
> Okay, Mr. Kraft?
>
> VENIREMAN KRAFT: I had a daughter that was raped.
>
> MR. PUTZEL: That's obviously a trauma that none of us would like to have to go through. I know it was for you as well as your daughter a terrible thing. Do you think because that obviously is an extremely violent, assaultive act, that your daughter's experience in that regard would affect your ability to be fair to Jerry Smith in this case? Because I will tell you that the woman who was killed in this case was a twenty year old woman, although there is no allegation of rape.
>
> VENIREMAN KRAFT: That's all she was.
>
> MR. PUTZEL: Do you think that would affect your ability to be fair in this case?
>
> VENIREMAN KRAFT: I don't know, I'd have to consider it.

After this colloquy, defense counsel made no further attempt to question Mr. Kraft on the subject. At the close of voir dire, however, defense counsel addressed the following question to the panel as a whole:

> Is there anyone who at this point presumes or thinks that Jerry Smith, as he sits here is now guilty of Capital Murder and therefore cannot be fair in this case? I see no one raising their hands.

■ In requesting that Mr. Kraft be stricken for cause, defendant made no reference to venireman Kraft's mention of his daughter, but premised the motion solely on his alleged inability to consider the full range of punishment. Defendant failed to preserve this claim, hence the issue is reviewable only for manifest injustice under Rule 29.12. *State v. Lee,* 617 S.W.2d 398, 399–400 (Mo.1981). The facts of this case do not warrant a finding of manifest injustice. Venireman Kraft did not assert he would be biased against appellant because of his past experience, but merely stated he would have to give more thought to this question before answering it. After indicating he needed to think about whether the past experience involving his daughter would affect his ability to be fair and impartial, and after being given an opportunity to reflect on whether he was capable of fairly judging the case or whether he would presume the defendant was guilty, Mr. Kraft,[3] as well as the rest of the panel, remained mute. In light of these facts, and again giving due regard to the trial court's opportunity to view the witness and hear his testimony, we do not find that manifest injustice or miscarriage of justice resulted from the trial court's failure to question venireman Kraft further or strike him for cause.

### III

Defendant next contends the trial court erred in sustaining the State's objection to defense counsel's inquiry during voir dire as to whether the potential jurors believed that a death sentence, if assessed, would be carried out. Defendant argues the paucity of executions in the United States has received wide publicity and a venireman's belief that a death sentence will not be

---

**3.** Mr. Kraft did not serve on the jury and there is no evidence in the record that defendant employed a peremptory challenge to exclude him.

carried out could substantially affect his decision on punishment; hence, the proposed question had a legitimate purpose and should have been allowed.

 The purpose of voir dire is to enable each party to participate in selection of a fair and impartial jury and to that end, wide latitude is allowed in examination of the panel. *State v. Lumsden,* 589 S.W.2d 226, 229 (Mo. banc 1979). During voir dire the defendant should be permitted to develop not only facts which might manifest bias and form the basis of a challenge for cause, but also such facts as might be useful to him in detecting the possibility of bias and intelligently utilizing his peremptory challenges. *State v. Brown,* 547 S.W.2d 797, 799 (Mo. banc 1977); *State v. Thompson,* 541 S.W.2d 16, 17 (Mo.App.1976). Nevertheless, the examination of jurors as to their qualifications is conducted under the supervision of the trial court and the nature and extent of the questions counsel may ask are discretionary with that court. *State v. Lumsden,* 589 S.W.2d 226, 229 (Mo. banc 1979). Rulings of the trial court during voir dire will be disturbed on appeal only when the record shows an abuse of discretion, *State v. Lumsden,* 589 S.W.2d at 229, and a real probability of injury to the complaining party. *State v. Olinghouse,* 605 S.W.2d 58, 68 (Mo. banc 1980).

The pertinent portion of the voir dire proceeded as follows:

MR. PUTZEL: How many of you believe that if you, in this case, were to find Jerry Smith guilty of Capital Murder and if you were to assess the death penalty, how many of you believe that Jerry Smith would be executed?

MR. BAUER: Your Honor, I object.

THE COURT: That will be sustained.

During the subsequent discussion, the court explained its ruling:

THE COURT: ... The Court is not going to permit that question for the reason that it constitutes in the Court's position, a disparagement of the administration of justice, and that it is a kind of question that plants a doubt in the minds of jurors about the law being carried out

in this State. And for that reason I consider it to be an improper question and it is not an appropriate question of prospective jurors, and the question is not going to be asked of future sections of the venire ....

Defendant cites *State v. Newlon,* 627 S.W.2d 606, 619–20 (Mo. banc 1982), cert. den. —— U.S. ——, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982), and argues our failure to find reversible error in the prosecutor's closing argument in that case mandates reversal here. However, *Newlon* does not stand for the proposition cited here by defendant. At the close of the punishment phase of the bifurcated proceeding in *Newlon,* also a capital murder case, the prosecutor argued without objection that a sentence of life imprisonment without possibility of parole for fifty years did not necessarily mean the defendant would serve fifty years, that the law could be changed or the sentence commuted. At least with a death sentence, the prosecutor continued, there would be some assurance the defendant would not commit any more crimes and others might be deterred from committing a robbery and taking a life just for money. Defendant contended on appeal that these remarks constituted impermissible argument of his criminal record as a reflection of his character and a basis for conviction to prevent future acts and that the trial court committed reversible error in failing *sua sponte* to declare a mistrial after the remarks were made. We responded that because such evidence was available for consideration during the penalty phase and was relevant to the issue of depravity, it was a permissible subject for argument during that phase of defendant's capital murder trial, 627 S.W.2d at 619–620. Just as we ruled in *Newlon* that the trial court did not abuse its discretion in failing *sua sponte* to declare a mistrial following relevant remarks of counsel, we determine here that the trial court did not abuse its discretion in excluding defense counsel's inquiry, which at best was only remotely relevant.

 In *State v. Olinghouse,* 605 S.W.2d 58, 69 (Mo. banc 1980), this Court held the

trial court did not err in refusing to allow defense counsel to inquire of the venireman whether they knew the penalty of life imprisonment for capital murder did not include the possibility of parole for 50 years. Defendant there contended the question would have permitted him to ascertain the existence of prejudice that might cause a juror to find the defendant guilty of capital murder rather than a lesser offense for which the possibility of parole existed. Nevertheless, we concluded:

> '... The question of future clemency is extraneous to a proper determination of issues of guilt and punishment by the jury. It should be of no concern to them....' Inasmuch as the proposed inquiry and the request for further instruction by the court related to matters 'of no concern' to the jury, the trial court did not abuse its discretion in its rulings.

605 S.W.2d at 69. Similarly in the case at bar, factors such as commutation, reversal of sentence on appeal or protracted litigation by the defendant which might delay or prevent execution of a death sentence were extraneous to a proper determination of guilt and punishment by the jury, and the court did not abuse its discretion in determining that the impropriety of jury speculation on such matters outweighed any potential benefit to the defendant. Defendant's contention is denied.

## IV

Defendant next asserts submission during the penalty phase of Instructions No. 25 [4] and No. 27,[5] which permitted imposition of the death penalty without a finding that beyond a reasonable doubt the mitigating circumstances in his case did not outweigh the aggravating circumstances found to exist violated his constitutional rights to due process of law. Defendant concedes this claim was rejected in *State v. Bolder,* 635 S.W.2d 673, 683–84 (Mo. banc 1982), but argues our treatment of the issue in *Bolder* was incomplete. He cites no persuasive precedent but argues the deprivation of life which may follow capital murder proceedings mandates the same threshold of proof for establishing no preponderance of mitigating circumstances as for establishing guilt. Permitting the jury to impose the death penalty when it finds the aggravating circumstance or circumstances equal any mitigating circumstances, defendant contends, substantially and unconstitutionally compromises the intended salutary effect of the jury's required consideration of mitigating circumstances.

---

4. In accordance with MAI–CR2d 15.44, Instruction No. 25 read:

 If you decide that a sufficient aggravating circumstance or circumstances exist to warrant the imposition of death, as submitted in Instruction No. 22, it will then become your duty to determine whether a sufficient mitigating circumstance or circumstances exist which outweigh such aggravating circumstance or circumstances so found to exist. In deciding that question you may consider all of the evidence relating to the murder of Karen Roberts.

 You may also consider
 1. Whether the murder of Karen Roberts was committed while the defendant was under the influence of extreme mental or emotional disturbance.
 2. Whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
 3. The age of the defendant at the time of the offense.

 You may also consider whether the defendant had a mental disease or defect at the time of the murder of Karen Roberts.
 You may also consider any circumstances which you find from the evidence in extenuation or mitigation of punishment.
 If you unanimously decide that a sufficient mitigating circumstance or circumstances exist which outweigh the aggravating circumstance or circumstances found by you to exist, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Division of Corrections without eligibility for probation or parole until he has served a minimum of fifty years of his sentence.

5. In accordance with MAI–CR2d 15.46, Instruction No. 27 read:

 Even if you decide that a sufficient mitigating circumstance or circumstances do not exist which outweigh the aggravating circumstance or circumstances found to exist, you are not compelled to fix death as the punishment. Whether that is to be your final decision rests with you.

■ We have reviewed our ruling on this point in *State v. Bolder,* 635 S.W.2d 673, 683–84 (Mo. banc 1982), and find no infirmity. The purpose of the reasonable doubt standard is to reduce the risk of convictions and executions based on *factual* error. *See In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). In Missouri, before a jury can consider a sentence of death, it must unanimously find beyond a reasonable doubt every fact necessary to establish guilt of a capital crime and the existence of at least one statutory aggravating circumstance, § 565.012, RSMo Cum.Supp.1982. Once these factual thresholds are crossed, however, the issue ceases to be one of *proof* and becomes one of *discretion:* will the jury, after considering all the evidence and aggravating and mitigating circumstances relevant to the crime and the defendant, recommend a sentence of death or life without eligibility for probation or parole for fifty years. The standard mandated by the Fourteenth Amendment for proof of ultimate facts does not control such an exercise of discretion.

■ In *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the United States Supreme Court held imposition of the death penalty under the standardless capital sentencing schemes of Texas and Georgia constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, 408 U.S. at 239–40, 92 S.Ct. at 2727, because unguided jury discretion created a substantial risk the death penalty would be inflicted in an arbitrary and capricious manner. *Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (opinion of Stewart, Powell and Stevens, JJ.), 220–21, 96 S.Ct. at 2947 (opinion of White, The Chief Justice, and Rehnquist, JJ.) (1976). As noted in *Bolder* 635 S.W.2d at 684, however, the United States Supreme Court later considered and upheld against the Eighth and Fourteenth Amendment attacks a statutory balancing process substantially indistinguishable, in pertinent parts, from Missouri's. *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Defendant claims there are "significant differences" between the Florida statute upheld in *Proffitt* and Missouri law, namely that under Florida law the sentence is determined by the trial judge rather than the jury, and the judge, if he imposes a death sentence, must set forth in writing his findings as to both aggravating and mitigating circumstances. We do not find these differences significant for purposes of the cruel and unusual punishment prohibition of the Eighth Amendment as applied to the states through the Fourteenth Amendment. The Missouri and Florida statutes are alike in that:

> The directions given to judge and jury by ... statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones[, and] ... [a]s a result, the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed.

*Proffitt v. Florida,* 428 U.S. at 258, 96 S.Ct. at 2969. The *Furman* requirement that sentencing discretion is guided and channeled by required examination of specific factors that argue for and against the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition, is satisfied in the Missouri, as well as the Florida, capital sentencing statutes.

■ No reason is advanced to interpret the cruel and unusual punishment provision of Art. I, Section 21, or the due process provision of Art. I, Section 10, of the Missouri Constitution differently in these respects from the United States Constitution, and we decline to do so. Defendant's point is denied.

### V

■ Defendant next contends the death penalty violates the cruel and unusual punishment clause of the Eighth Amendment and the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, as well as

the due process clause of Art. I, § 10, the cruel and unusual punishment provision of Art. I, § 21 and the "natural right to life" clause of Art. 1, § 2 of the Missouri Constitution. Defendant cites *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), particularly Justice Marshall's observation that "the burden of capital punishment falls upon the poor, the ignorant, and the underprivileged members of society." 408 U.S. at 365–66, 92 S.Ct. at 2791. Our discussion in *State v. Newlon*, 627 S.W.2d 606, 612–13 (Mo. banc 1982), cert. den. —— U.S. ——, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982), disposes of all but the equal protection claim. Examination of that claim reveals nothing of merit. Defendant offers no basis for sustaining his broad, unsupported conclusional argument that the law is somehow violative of his rights to equal protection. This point is denied.

## VI

For his next contention defendant asserts the trial court erred in submitting instructions which excepted from the definition of "mental disease or defect" the conditions of "alcoholism without psychosis, drug abuse without psychosis or an abnormality manifested only by repeated anti-social conduct." Defendant complains there was no evidence to support these instructions and, as they compromised his diminished capacity defense, their submission violated his constitutional rights to due process of law.

At trial, defense counsel argued that a personality disorder rendered defendant incapable of the cool deliberation required for capital murder. Section 552.030.3, RSMo Cum.Supp.1982, provides that evidence of mental disease or defect is admissible to prove the defendant did not have the required state of mind that is an element of the offense and for the purpose of determining whether a defendant convicted of a capital offense shall be sentenced to death or life imprisonment. Section 552.010 expressly excludes from the definition of "mental disease or defect" alcoholism without psychosis, drug abuse without psychosis and abnormalities manifested only by repeated criminal or otherwise antisocial conduct.[6] In accordance with these statutes, Notes on Use 4 to MAI–CR2d 3.74 and MAI–CR2d 2.32 instruct that when mental disease or defect is submitted to a jury, the term shall be defined as follows:

The phrase 'mental disease or defect,' as used in these instructions, means any mental abnormality, regardless of its medical label, origin or source (except alcoholism without psychosis) (except drug abuse without psychosis) (or) (except an abnormality manifested only by repeated anti-social conduct).

In determining under other instructions given to you, whether the defendant had a mental disease or defect at the time of the commission of the offense charged against him and, if so, the extent and effect of it, the jury may take into consideration all of the facts, circumstances and opinions given in evidence. However, it is for the jury alone to decide this issue under the law as given to you in these instructions.

Notes on Use 2 following MAI–CR2d 2.32 specifies:

2. The three parenthetical matters deal with special situations, the last of which is sociopathy or, as it is sometimes known, psychopathy. See Section 552.010, RSMo. All should be omitted unless the evidence justifies calling them to the jury's attention. If there is evidence justifying reference to any one or more of such mat-

---

6. Section 552.010 provides:

 The terms 'mental disease or defect' include congenital and traumatic mental conditions as well as disease. They do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, whether or not such abnormality may be included under mental illness, mental disease or defect in some classifications of mental abnormality or disorder. The terms 'mental disease or defect' do not include alcoholism without psychosis or drug abuse without psychosis or an abnormality manifested only by criminal sexual psychopathy as defined in section 202.700, RSMo, nor shall anything in this chapter be construed to repeal or modify the provisions of sections 202.700 to 202.770, RSMo.

ters, it or they should be included in the instruction.

■ When there is no evidence in a case of alcoholism or drug abuse without psychosis or repeated antisocial behavior, but there is evidence of mental disease or defect, this instruction serves to minimize jury confusion by omitting extraneous matters. When there is evidence of alcoholism or drug abuse without psychosis or antisocial behavior *and* evidence of mental disease or defect, however, the parenthetical matters in MAI–CR 2.32 serve to clarify the law for the jury by distinguishing between these conditions.

■ In response to questioning by defense counsel, Dana Osia testified that while she, Karen Roberts and the defendant were driving around the night of the murder, defendant drank a beer, smoked marijuana and appeared "to be high." In response to a question from defense counsel a police officer testified to hearing a statement by defendant that on the day Karen

Roberts was killed he had been drinking beer and taking a "downer" called Placidyl. In his direct examination of the psychiatrist, defense counsel elicited testimony that defendant had a history of at least two suicidal episodes, one of which involved an overdose, expulsion from school for fighting, frequent drug and alcohol use and "angry attacks" at other people. The psychiatrist also testified that defendant was not suffering from any psychosis. Police testimony indicated that defendant's arrest occurred in the Alcohol Abuse unit of Compton Hills Medical Center and, defendant's mother testified, he had had a drinking problem for several years. Clearly, there was ample evidence of alcoholism and drug abuse without psychosis and of repeated antisocial conduct to justify the trial court's conclusion that the jury might benefit from the clarifying instructional phrases.

We have reviewed the pertinent jury instructions submitted during defendant's trial.[7] The jury was told three times, by

---

7. Instruction Nos. 6, 7, 8 and 9 patterned respectively after MAI—CR2d 2.32, 15.02, 3.02 and 3.74 were submitted during the guilt phase of defendants trial:

Instruction No. 6
The phrase 'mental disease or defect,' as used in these instructions, means any mental abnormality, regardless of its medical label, origin or source except alcoholism without psychosis, drug abuse without psychosis or an abnormality manifested only by repeated anti-social conduct.

In determining under other instructions given to you, whether the defendant had a mental disease or defect at the time of the commission of the offense charged against him and, if so, the extent and effect of it, the jury may take into consideration all of the facts, circumstances and opinions given in evidence. However, it is for the jury alone to decide this issue under the law as given to you in these instructions.

Instruction No. 7
If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about September 9, 1980, in the City of St. Louis, State of Missouri, the defendant caused the death of Karen Ann Roberts by striking her, and

Second, that the defendant intended to take the life of Karen Ann Roberts, and

Third, that the defendant knew that he was practically certain to cause the death of Karen Ann Roberts, and

Fourth, that the defendant considered taking the life of Karen Ann Roberts and reflected upon this matter coolly and fully before doing so, and

Fifth, that defendant is not entitled to be acquitted of the offense of capital murder by reason of Instruction No. 9, then you will find the defendant guilty of capital murder.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

Instruction No. 8
If you do not find and believe from the evidence beyond a reasonable doubt that the defendant considered taking the life of Karen Ann Roberts, and reflected upon this matter coolly and fully before doing so, you must find the defendant not guilty of capital murder.

Instruction No. 9
Evidence that the defendant had a mental disease or defect may be considered by you in determining whether the defendant had or did not have the state of mind required of capital murder and set out in Instruction 7 as an element of that offense.

If, after considering all of the evidence, including evidence that the defendant did or did not have a mental disease or defect, you find and believe from the evidence that the defendant engaged in the conduct submitted in Instruction No. 7 but have a reasonable

Instructions No. 7, 8 & 9, that they could find the defendant guilty of capital murder only if they found he considered taking the life of Karen Roberts and reflected upon the matter coolly and fully before doing so, and defendant's assertion of metal disease or defect was not diluted by the trial court's accurate statements of the law. During the penalty phase of defendant's trial, the jury was instructed by Instruction No. 25 to consider any extenuating or mitigating circumstances found from the evidence, including but not limited to whether he had a mental disease or defect at the time of Karen Roberts' murder. We fail to find error or the slightest unfairness in these instructions.

## VII

■ Defendant contends that § 565.-012.2(7), RSMo Cum.Supp.1982, is so broad and vague in its wording, as well as its construction and application by this Court, as to violate the Eighth and Fourteenth Amendments to the United States Constitu-

tion and Article I, Section 2, 10 and 21 of the Missouri Constitution.

Section 565.012, RSMo Cum.Supp.1982, provides:

1. In all cases of capital murder for which the death penalty is authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider:

(1) Any of the statutory aggravating circumstances enumerated in subsection 2 which may be supported by the evidence;

. . . . .

2. Statutory aggravating circumstances shall be limited to the following:

. . . . .

*(7) The offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind;*

. . . . .

4. . . . The jury, if its verdict is a recommendation of death, shall designate in

doubt that he acted only after considering taking the life of Karen Ann Roberts and reflecting upon this matter coolly and fully before doing so, then you must find the defendant not guilty of the offense of capital murder as submitted in Instruction No. 7.

Instructions No. 25 and 26, patterned respectively after MAI–CR2d 15.44 and 2.32, were submitted during the penalty phase of defendant's trial:

### Instruction No. 25

If you decide that a sufficient aggravating circumstance or circumstances exist to warrant the imposition of death, as submitted in Instruction No. <u>22</u>, it will then become your duty to determine whether a sufficient mitigating circumstance or circumstances exist which outweigh such aggravating circumstance or circumstances so found to exist. In deciding that question you may consider all of the evidence relating to the murder of Karen Roberts.

You may also consider

1. Whether the murder of Karen Roberts was committed while the defendant was under the influence of extreme mental or emotional disturbance.

2. Whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

3. The age of the defendant at the time of the offense. You may also consider whether

the defendant had a mental disease or defect at the time of the murder of Karen Roberts.

You may also consider any circumstances which you find from the evidence in extenuation or mitigation of punishment.

If you unanimously decide that a sufficient mitigating circumstance or circumstances exist which outweigh the aggravating circumstance or circumstances found by you to exist, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Division of Corrections without eligibility for probation or parole until he has served a minimum of fifty years of his sentence.

### Instruction No. 26

The phrase 'mental disease or defect,' as used in these instructions, means any mental abnormality, regardless of its medical label, origin or source except alcoholism without psychosis, except drug abuse without psychosis or except an abnormality manifested only by repeated anti-social conduct.

In determining under other instructions given to you, whether the defendant had a mental disease or defect at the time of the commission of the offense charged against him and, if so, the extent and effect of it, the jury may take into consideration all of the facts, circumstances and opinions given in evidence. However, it is for the jury alone to decide this issue under the law as given to you in these instructions.

writing, signed by the foreman of the jury, the aggravating circumstance or circumstances which it found beyond a reasonable doubt.

5. Unless at least one of the statutory aggravating circumstances enumerated in this section is so found, the death penalty shall not be imposed.

(Emphasis added.)

In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the United States Supreme Court upheld the facial validity of a provision substantively indistinguishable from § 565.012.2(7) against Eighth and Fourteenth Amendment challenges. As no authority is advanced for a different interpretation of Missouri's constitution, we see no reason to reconsider our rejections of defendant's claim in *State v. Blair,* 638 S.W.2d 739, 758 (Mo. banc 1982), and *State v. Newlon,* 627 S.W.2d 606, 621 (Mo. banc 1982), cert. den. —— U.S. ——, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982).

In addition it has been held in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), that capital murder statutes must be construed in such a manner that the nature of a crime and all the circumstances justify imposition if the death penalty so as not to violate a defendant's rights to freedom from cruel and unusual punishment and to due process of law. In *Godfrey,* a death sentence based on the single aggravating circumstance that two murders were "outrageously or wantonly vile, horrible or inhumane in that [they] . . . involved . . . depravity of mind" was reversed when it could not be said the crimes "reflected a consciousness materially more 'depraved' than that of any person guilty of murder." 446 U.S. at 433, 100 S.Ct. at 1767. In this case, however, defendant's sentence was not predicated on a general finding of depravity of mind. On the form in which defendant's punishment was fixed at death, the jury designated in a handwritten finding the following aggravating circumstance:

> The evidence showed to the jury unanimously and beyond a reasonable doubt that the defendant did torture Karen Ann Roberts by: shoving her down, then chasing her for two and one half blocks all the while holding an eight pound iron bar in his hand and then beat her repeatedly about the upper body and head, causing her death.
>
> We the jury also find that these actions were outrageously and wantonly vile, horrible and inhuman.

Clearly, there was evidence from which the jury could find beyond a reasonable doubt that defendant intended to cause the victim suffering before her death. In his letter to the St. Louis Globe Democrat, defendant said "I had a gun on me at the time but I thought shooting would be too damn good for her. I wanted her to feel some pain so I beat her little lousy head in." The question of whether the defendant caused Karen Ann Roberts to suffer before she died was a jury question, and the evidence was sufficient to submit the issue. The mounting terror and horrible anticipation of a grisly fate intentionally inflicted by defendant on Karen Roberts as he pursued her over a distance of two and one half blocks with what she knew was a heavy metal cudgel, together with his initial and repeated bludgeoning of her upper body and head is sufficient beyond a reasonable doubt to constitute an offense "outrageously or wantonly vile, horrible or inhuman in that it involved torture" and satisfy the requirement of *Godfrey.* We find § 565.012.2(7) was validly applied in this case.

## VIII

We turn now to the statutorily mandated review of defendant's death sentence. § 565.014.

There is no allegation nor do we find evidence that Gerald Smith's death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. The record factually supports the verdict. As discussed in the preceding point, the evidence also supports the jury's finding of the statutory aggravating circumstance beyond a reasonable doubt and the sentence of death by a rational trier of fact. Considering the crime and the defendant, we have reviewed the records of the twenty-two capital cases in which death and life imprisonment have been submitted

to the jury under the law effective May 26, 1977, in which the jury agreed on punishment and which have been decided on appeal. Here the record discloses that defendant (1) caused the death of Karen Roberts by (2) brutally beating her with an iron bar while (3) intending her to suffer, (4) causing her to suffer, (5) cold-bloodedly planning the murder four months in advance, and that (6) defendant is without remorse. The sentence of death is not disproportionate to the penalty imposed in similar cases, and the judgment is affirmed.

Date of execution set for June 10, 1983.

WELLIVER, HIGGINS and GUNN, JJ., and FINCH, Senior Judge, concur.

SEILER, Senior Judge, concurs in separate opinion filed.

DONNELLY, J., dissents in separate opinion filed.

BILLINGS and BLACKMAR, JJ., not participating because not members of the Court when cause was submitted.

SEILER, Senior Judge, concurring.

In deciding whether the death penalty in this case is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, § 565.014.3(3), RSMo 1978, the court again fails to state how or in what way this case differs from the many cases where the homicide was just as bad or worse, yet the jury elected life without parole for fifty years as punishment, not death. See the numerous cases set forth in No. 63569, *State v. LaRette*, 648 S.W.2d 96 (Mo. banc 1983) handed down March 29, 1983, and *State v. Newlon*, 627 S.W.2d 606, 628–633, Seiler, J., dissenting.

Never before has this court had the authority to reduce a sentence on the ground it is disproportionate. Because a life is at stake and because of its concern that there be no arbitrary imposition of the death penalty, the legislature has imposed this duty upon us. The principal opinion, however, says no more than that "we have reviewed the records of the twenty-two [other] capital cases in which death and life imprisonment have been submitted to the jury", without distinguishing any of them. All an observer learns from this is that to the values of the court there is nothing wrong with the death sentence here. No similar case or cases are pointed out or relied upon. Nothing is said as to why this death sentence is not disproportionate to the penalty imposed in similar cases. What is lacking is a demonstration that similar cases are not punished in Missouri less severely than the offense before us.

No information is given as to how this death sentence compares with the values of the community as reflected by the verdicts of juries in similar cases. Juries selected from the community determine the sentence in these capital murder cases. It is proportionality as to what juries do with similar cases which the statute calls on us to evaluate. This, as I have attempted to illustrate on earlier occasions, we are failing to do. I do not approve of this, but under compulsion of *State v. LaRette, supra,* I concur in the affirmance of judgment.

DONNELLY, Judge, dissenting.

In my view, this case comes within the *Godfrey* interdiction.

I respectfully dissent.