**Gerald SMITH, Appellant,**

v.

**William ARMONTROUT, Appellee.**

**No. 88–2359.**

United States Court of Appeals, Eighth Circuit.

Submitted May 8, 1989.

Decided Oct. 17, 1989.

Rehearing and Rehearing En Banc Denied Jan. 2, 1990.

C. John Pleban, St. Louis, Mo., for appellant.

Stephen D. Hawke, Jefferson City, Mo., for appellee.

Before ARNOLD, JOHN R. GIBSON and FAGG, Circuit Judges.

ARNOLD, Circuit Judge.

Gerald Smith is under sentence of death for the murder of Karen Roberts, which occurred in St. Louis, Missouri, in 1980. He brings this petition for habeas corpus under 28 U.S.C. § 2254, claiming that both his conviction and his sentence violate the Constitution of the United States. The District Court [1] denied the petition. *Smith v. Armontrout,* 692 F.Supp. 1079 (W.D.Mo. 1988). Smith appeals. In addition, after the appeal was filed, new court-appointed

counsel filed a motion to remand the case to the District Court, seeking to raise new contentions that had not been included in the habeas petition as filed. We affirm the judgment of the District Court, denying the writ, and also deny the motion to remand. As soon as the rehearing process in this Court has run its course, the stay of execution previously entered, *Smith v. Armontrout,* 865 F.2d 1515, 1516 (8th Cir.1988) (order), will be dissolved.

### I.

We start with a summary of the facts of the crime, in order to place the legal arguments in context. By "facts" we mean what a reasonable jury could have found, on the basis of substantial evidence in the record of the trial, which took place in the Circuit Court of the City of St. Louis in 1981. The opinion of the Supreme Court of Missouri on Smith's direct appeal ably summarizes the record, and we can do no better than to set forth its statement, *State v. Smith,* 649 S.W.2d 417, 420–21 (Mo.) (en banc), *cert. denied,* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983):

> From the substantial evidence adduced supportive of the verdict, the jury could reasonably have found the following: At approximately 8:00 p.m. on September 8, 1980, defendant and Dana Osia, a girl he had known about four years and had been dating for a week, went driving in Dana's car. After an hour or so, defendant announced his intention to visit a person who he said was his cousin. Defendant told Dana he was going to hurt this person because she had once given him "the clap." At approximately 9:30 p.m., defendant and Dana drove to the home of Karen Roberts, where defendant invited Karen to take a ride. Initially she refused, but defendant persuaded her to go. After driving about for another hour or so, the three stopped near defendant's house and talked for awhile. During the conversation, defendant asked Dana four times to go home, and

---

**1.** The Hon. Scott O. Wright, Chief Judge, United States District Court for the Western District of Missouri.

Dana finally agreed. Although Dana offered to drive Karen home, Karen was persuaded to stay by defendant, and Dana left alone.

Sometime after Dana's departure, defendant left his house with Karen Roberts to walk her home. According to defendant's subsequent confession, during the walk they argued as to whether she had given him venereal disease. At one point, Karen cursed him and defendant pushed her to the ground. When she got up, Karen was holding a heavy metal bar which she swung at the defendant. Defendant blocked the blow and jerked the bar away; when Karen started to run, defendant gave chase. Carrying the metal bar, defendant chased Karen Roberts across the street, north for half a block, east for half a block to some railroad tracks, north along the tracks for a full block and across another street, where he finally caught her. There, defendant bludgeoned Karen to death with the metal bar. An autopsy on the body of Karen Roberts revealed massive head injuries. The back of her skull was caved in; she suffered six head lacerations, skull fractures "too numerous to count," and multiple contusions and bruises of the brain beneath the skull. These injuries were consistent with multiple blows, inflicted with the heavy iron bar identified as the murder weapon. Any one of the blows could have rendered Karen unconscious or caused her death. Karen also suffered abrasions on her face and contusions of the shoulder, arm, hip and thigh. On a scale of "one to ten," an expert witness rated the seriousness of Karen's injuries at "eight."

Dana next saw defendant on the evening of September 9, 1980, when she,

defendant and defendant's brother, Eugene, went driving. At one point, Eugene left the car to go into a liquor store, and defendant told Dana he had killed the girl they picked up the night before, which was why he had wanted her to leave. When Dana did not believe he had committed a murder, defendant showed her a newspaper story about the killing. Nine days later, defendant was arrested. After receiving *Miranda* warnings and executing a waiver, defendant initially denied the murder but later admitted, "I killed the bitch" and gave a detailed statement of the events described above. Defendant also accompanied police officers to the murder scene, where he assisted in locating and identifying the iron bar he used to kill Karen Roberts. The bar was approximately 18½ inches long and weighed about eight pounds. Defendant was charged with capital murder.

Other facts will be stated, or aspects of the record amplified, as necessary in connection with our discussion of the various constitutional arguments petitioner now asserts.

## II.

The District Court's thorough and comprehensive opinion, obviously reflecting a painstaking and thoughtful consideration of all the issues, makes our task easier. We do not have a great deal to add to it. We will discuss, however, the major arguments advanced on appeal against the District Court's reasoning and conclusions.[2]

## A.

Petitioner argues that his trial counsel was constitutionally ineffective in two re-

2. Three of petitioner's arguments deserve no more than cursory mention. He claims that his trial lawyer should have been allowed to ask the jury panel, on voir dire, whether they believed that the death penalty would actually be carried out, if the jury should ultimately return a verdict of death. He also argues that three members of the venire were wrongly excused for cause under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and that the closing argument of the prosecution was so inflammatory as to be fundamentally unfair. We agree with the District Court that all these arguments are without merit, and we adopt its reasoning. In addition, the last two points are procedurally barred. They were not properly preserved in the state courts, and no ground exists to hold either that the "cause" and "prejudice" requirements of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), are satisfied, or that some exception to the procedural-bar doctrine is justified by this record.

spects:[3] (1) in not offering in evidence records of petitioner's treatment, before the murder, at Alexian Brothers Hospital in St. Louis; and (2) in not presenting evidence to dispute the damaging admissions in a letter that petitioner wrote, before trial, to the *St. Louis Globe–Democrat.*

1.

■ At trial, petitioner's main defense was "diminished capacity"—that, because of a personality disorder, he lacked the ability to deliberate or premeditate, to form the mental state necessary to commit the crime of murder. Through counsel, he admitted killing Karen Roberts, Trial Transcript (T.Tr.) 618, and told the jury that at most they could convict him of murder in the second degree. (In fact, Smith himself has now admitted, under oath, that he killed Ms. Roberts. He did so last year, at the evidentiary hearing before the District Court in this habeas case.[4] This fact makes all the more astounding some of the arguments now made in the Motion to Remand.) The principal witness in support of the defense was Sadashir Parwatikar, M.D., a psychiatrist. He testified that Smith suffered from "borderline personality disorder."[5] This diagnosis describes someone who, in reaction to particular experiences—in Smith's case, a tragic history of severe child abuse—behaves very impulsively, either acting or speaking on the spur of the moment without calculating the long-term effects on himself. This disorder, Dr. Parwatikar thought, made it either impossible or difficult for Smith to plan the killing. Therefore he was guilty of only manslaughter, or at any rate nothing worse than second-degree murder.

In giving this testimony at trial, Dr. Parwatikar did not refer to, nor did trial counsel offer in evidence, records of Smith's

treatment, in 1979 and 1980, at Alexian Brothers Hospital. These records, Smith now claims, would have aided his defense, and trial counsel was constitutionally ineffective for not discovering and using them. The records, which are now before us as an exhibit to Dr. Parwatikar's testimony at the habeas hearing, contain a wealth of detail about Smith's history and condition. They contain comments from physicians at the hospital of which the following are typical: Smith has "a tremendous problem with a severe paranoid personality disorder with almost no control over hostility or aggressive activity." H.Tr. 11. Smith is not psychotic, but "his problem with chronic obsessive thinking of hostile thoughts and activity is a problem of mammoth proportions." *Id.* at 12. He "[m]ight [even] be a candidate for psychosurgery," *id.* at 13–14, that is, a frontal lobotomy.

Trial counsel was John Putzel, at the time an Assistant Public Defender. He testified, and the District Court believed, that he had either seen the records before trial, or in some other way become familiar with their contents, for example, by talking with someone at Alexian Brothers. He discussed the Alexian Brothers treatment with Dr. Parwatikar, who told him he would take it into account in making his diagnosis, as indeed he did. (Dr. Parwatikar referred at trial to the fact that Smith had been admitted to Alexian Brothers.) The doctor never told Mr. Putzel he needed the records, nor asked to see them. Counsel decided not to offer the records in evidence, and not to examine Dr. Parwatikar explicitly about them, because the records contained a great deal that would (in his opinion) have hurt Smith in the eyes of the jury—accounts of arrests, incidents of violence, and statements evidencing a recalcitrant and unrepentant attitude. Notations

---

**3.** The Motion to Remand also questions certain aspects of trial counsel's performance, as well as the conduct of the different lawyer who filed and tried this habeas petition in the District Court. These issues will be discussed in Part III. of this opinion.

**4.** See Habeas Transcript (H.Tr.) 97:
  Q. You made the statement that you killed Karen Roberts, that was true was it not?

A. Well, yeah. . . .

**5.** Dr. Parwatikar explained at the habeas hearing that this condition is not a psychosis, nor is it a mental disease or defect within the meaning of Missouri law. He added that Smith was capable of reflecting on the nature of his crime, determining right from wrong, and conforming his conduct to the requirements of the law. H.Tr. 27.

in the exhibit in question stated, among other things, that Smith had "little interest in changing his situation," H.Tr. 37, had "no ambition to change to a less volitile [sic] temprament [sic]," *id.* at 40, said "fear of prison did not affect him," *id.* at 41, and "showed no signs of remorse or worries." *Ibid.*

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), sets out the now familiar standard for judging this kind of claim. We first ask whether counsel's conduct was deficient in some significant respect, falling below what a reasonably skillful lawyer would have done. The issue is not difficult. Most trial lawyers, we think, would have done exactly what Mr. Putzel did, and rightly so. It might also have been reasonable to use the records, and hope the jury would not have been too affected by the bad parts. But it was clearly reasonable to do what counsel did: offer the defense, support it with expert testimony, but leave out documents that would at best have brought some additional increment of support for the diagnosis, while also carrying a substantial risk of playing into the hands of the State's argument that Smith was a depraved and dangerous man who would not be deterred by mere imprisonment. We hold that counsel's conduct was not deficient.

No more need be said, but we add that, even if counsel's performance could be faulted, Smith could not meet the other part of the *Strickland* standard. Offering the Alexian Brothers records would not have created a reasonable probability of a different verdict, and the failure to offer them does not undermine our confidence in the verdict that was returned. They would not have changed Dr. Parwatikar's diagnosis at all. They contained "[b]asically the same information" as that on which his opinion at trial was based, H.Tr. 20. He conceded that the jury "considered the same set of symptoms ... [I've] described this morning...." *Id.* at 21. His first report, written before the trial, referred to information obtained from a physician at Alexian Brothers, *id.* at 23, and he had an adequate basis for diagnosis without look-ing at the documents themselves. *Id.* at 24.

One can speculate that a greater or different use of the records would have made Dr. Parwatikar's testimony more persuasive to the jury. Of course we cannot know for certain that it would not have. But the burden of establishing a reasonable likelihood that the verdict would have been different is a heavy one, and it rests squarely on Smith, who asks us to upset the final judgment of a state court of competent jurisdiction. We are not convinced. The likelihood, to the extent one can know it at this point in time, is that the records would have hurt at least as much as they helped. We do not think that decisions of lawyers should be fly-specked long after the fact in an effort to turn up some arguable imperfection. We reject this claim of ineffective assistance of counsel.

## 2.

■ The next specification of ineffectiveness leveled against trial counsel revolves around a letter, written by Smith, that was introduced in evidence against him at trial. As read to the jury, this is what the letter said:

Globe Democrat Publishing Company

710 North Tucker Boulevard

St. Louis, Missouri 63101

You people wrote the story on me back in September all wrong. So I am giving you the real story. I Gerald Smith killed Karen Roberts. I have been looking for her for four months so I could kill her. On September 8th, 1980, I finally got my chance to kill her and I done just that. I had a gun on me at the time but I thought shooting her would be too damn good for her. I wanted her to feel some pain so I beat her little lousy head in. If she were living now I would do it all over to her again. She gave me a dose of the clap back in April, 1980, and because of that my fiancee Joyce Dodson left me over it. I planned on killing her ever since.

    Gerald Smith

    The Cold–Blooded Killer

T.Tr. 510–11. The letter was dated March 14, 1981, while Smith was in jail awaiting trial.

Mr. Putzel objected strenuously to the admission of the letter, T.Tr. 489, but the objection was overruled. He did, however, stipulate that Gerald Smith's fingerprints were found in three places on the letter, that a qualified handwriting expert had concluded that the writing in the letter was Smith's, and that Smith did in fact write the letter. T.Tr. 509–10.

Smith now contends that counsel should not have entered into the stipulation, and that counsel should have called certain witnesses to contradict some of the statements in the letter.[6] First, as far as the stipulation is concerned, it was solidly based in fact. Everything counsel stipulated to was true—including the ultimate fact, that Smith wrote the letter. Smith himself has admitted under oath that he wrote the letter, and that he did it "of [his] own free will." H.Tr. 106. The State could in fact have introduced evidence of the fingerprints, and could in fact have called the handwriting expert, and we have no doubt that it would have done so had Mr. Putzel refused to stipulate. We have no fault to find with counsel's conduct on this score. He gave the following explanation:

> ... at that point I suppose I had tried 20 or 25 jury trials ... my thought quite simply was this, that if [I] put the State through jumping hurdles to get that letter into evidence, that I would only highlight its importance and it would ultimately come in anyway and I knew that in fact it would have come in and I still believe to this day that it would have come in.

H.Tr. 148. Every trial lawyer will recognize the soundness of this reasoning. We

hold that counsel's performance was not deficient.

█ Smith further argues that counsel should have called witnesses to rebut the letter, to prove that it was not true or was not intended to be serious. Chief among those witnesses is a man named Walter Hagan, whose existence became known after the verdict of guilty had been returned, but before the penalty phase of the trial began. Hagan called the Public Defender's office about the case, and counsel spoke to him on the telephone twice. He said he had been an inmate in the city jail, with Smith, during the first week or so of March, 1981. He apparently told counsel that the letter to the *Globe–Democrat* had been written on a dare or a bet, or as a joke. Because this information fit the theory of the defense—that Smith did not premeditate or deliberate the killing—counsel moved for a mistrial, to permit him to bring Hagan in as a witness. The motion was denied. The Court said:

> I'm going to overrule any Motion for Mistrial at this stage, on the basis of this late information, because frankly assuming as true everything that you stated, these portions of what Mr. Hagens [sic] said to you that would constitute admissible evidence, it doesn't seem to me would in any way materially affect the verdict that's been received.

T.Tr. 656.

Petitioner now argues that counsel should have called Hagan as a witness in the penalty phase of the trial, or, if Hagan could not be located right away, moved for a continuance to enable a search to be made for him. As for actually calling Hagan as a witness, it seems that counsel could not find him. H.Tr. 159. A continuance could have been requested, and per-

---

**6.** Petitioner also claims that it was a violation of due process for counsel to make the stipulation without his consent. We reject this contention. In the first place, it appears that petitioner did consent to the stipulation. T.Tr. 489. It is not necessary for this consent to appear explicitly in the record. The letter was extremely damaging, but the stipulation was not the equivalent of a plea of guilty, and did not have to be accompanied by all of the procedural formulations designed to protect defendants from involuntary

or unintelligent pleas of guilty. Counsel did not admit that what was in the letter was true. On the contrary, he attempted to cast doubt on the truth of the letter by expert testimony, testimony to the effect that Smith was so disordered and impulsive that he was incapable of deliberating on anything, T.Tr. 567, and that writing the letter was an irrational act, *id.* at 565. In any event, for reasons given in text, the letter would have come in anyway, even in the absence of any stipulation.

haps it should have been, but there is no reason to suppose that Hagan could have been found if a continuance had been obtained. Mr. Putzel looked for him in vain during his work on the motion for new trial. Eugene Bushmann, the lawyer who filed Smith's habeas petition, also tried to find Mr. Hagan, without success, and C. John Pleban, Smith's present lawyer, informed us at the oral argument that Hagan had even then not been located. We do not believe, in any case, that the jury would have thought much of Hagan's evidence. If expert testimony did not persuade the jury to discount the letter, testimony like this from a fellow inmate would not have done so either. We hold that no violation of the Sixth Amendment occurred by reason of the Hagan incident.

▮ Petitioner also argues that he gave counsel the names of three other witnesses, his brother William, his sister Linda, and his former girlfriend, Joyce Dodson. (At one point Smith told counsel that the statements in the letter about pursuing the victim and planning to kill her weren't true. The names of these witnesses may have been suggested at that time, though counsel has no recollection of this. H.Tr. 142. Later, Smith told Mr. Putzel that if he were to testify he would admit the version of events contained in his confession and in the letter.) William and Linda, petitioner says, would have testified that they saw Smith with Karen, the victim, less than four months before the murder, thus rebutting the statement in the letter that Smith had been looking for Karen for four months to kill her. And Joyce would have testified that she and Gerald separated before Gerald contracted the venereal disease, thus rebutting the statement in the letter that Gerald killed Karen because the venereal disease Karen gave him caused Linda to leave him.

We reject this contention. Counsel did interview Joyce Dodson before trial, twice in fact, H.Tr. 142, and she testified as a witness during the penalty phase, T.Tr. 663 et seq. Joyce said nothing, either in her interview with counsel or in her testimony,

to contradict any part of the *Globe–Democrat* letter. Furthermore, counsel spoke before trial with Smith's brother Timothy and perhaps with his brother Eugene as well, and neither they nor any other relatives of petitioner "provided ... any information which suggested that they were [able] to directly contradict what the letter said from their knowledge of the incident." H.Tr. 143. We cannot see, in any case, that it would have helped appreciably for William and Linda to testify that Gerald and Karen had been apart less than four months before the murder. That Gerald had stalked his victim for, say, three months instead of four—and that is no doubt how the State would (justifiably) have characterized this contention—is not a very impressive argument. We hold that petitioner received the effective assistance of counsel required by the Sixth Amendment.

### III.

▮ The final contention made by petitioner as part of his appeal properly so called, as opposed to the motion to remand, has to do with the aggravating circumstance found by the jury when it fixed his penalty at death. The jury was instructed, in the words of Mo.Rev.Stat. § 565.012.2(7) (1977) (repealed October 1, 1984), that it could find the existence of an aggravating circumstance if the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind."[7] The jury made the following handwritten finding:

> The evidence showed to the jury unanimously and beyond a reasonable doubt that the defendant did torture Karen Ann Roberts by: shoving her down, then chasing her for two and one-half blocks all the while holding an eight-pound iron bar in his hand and then beat [sic] her repeatedly about the upper body and head, causing her death. We the jury also find that these actions were outrageously and wantonly vile, horrible and inhuman.

---

7. This language is now found, unchanged, in    Mo.Rev.Stat. § 565.032 (Supp.1987).

See *State v. Smith, supra,* 649 S.W.2d at 434.

Petitioner contends that the aggravating circumstance found against him was so vague and indefinite that it left the jury completely to its own devices, without any ascertainable standard for distinguishing murders that deserve the death penalty from murders that do not. The Eighth Amendment requires that state law define with reasonable specificity the circumstances under which the penalty of death may be imposed. Otherwise, the penalty may be carried out freakishly or capriciously, in a completely unpredictable fashion. If the aggravating circumstance involved here were a simple reference to murders "outrageously or wantonly vile, horrible or inhuman in that [they] involved ... depravity of mind," petitioner might have a point. A similar aggravating circumstance was held invalid in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), on the ground that the murder committed there was not materially more depraved than murder in general. All murder, after all, is horrible, vile, inhuman, and so forth. But here the verdict of the jury was not limited to those general terms. It found specifically that the murder involved "torture," a concept of more definite content, and even detailed the evidence that supported the finding. This amounts to a limiting construction of the statute, or to an application of its words sufficiently constrained by a definite standard to escape condemnation under the Eighth Amendment. See *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 1859–60, 100 L.Ed.2d 372 (1988), stating that "some kind of torture or serious physical abuse is [a sufficient] limiting construction" to save a similar aggravating circumstance. See also *Mercer v. Armontrout,* 864 F.2d 1429, 1435 (8th Cir.1988), *stay denied,* —— U.S. ——, 109 S.Ct. 773, 102 L.Ed.2d 766 (1989), upholding Mo.Rev.Stat. § 565.012.2(7).

The possibility remains that, however valid the "torture" limiting construction may be as a matter of law, the evidence introduced by the State was legally insufficient to prove it. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), holds that due process forbids a criminal conviction unless the evidence before the jury was sufficient to enable rational jurors to find every element of the offense beyond a reasonable doubt. At stake here is not the conviction, but the punishment. But in capital cases punishment is determined in a formal trial process in which certain predicate facts must be proved by the State beyond a reasonable doubt. So, by analogy with *Jackson,* due process would forbid a verdict of death unless the evidence was sufficient to convince a rational trier of fact, beyond a reasonable doubt, of the existence of at least one aggravating circumstance. The evidence here is summarized aptly in the opinion of the Supreme Court of Missouri:

> Clearly, there was evidence from which the jury could find beyond a reasonable doubt that defendant intended to cause the victim suffering before her death. In his letter to the *St. Louis Globe–Democrat,* defendant said, "I had a gun on me at the time[,] but I thought shooting would be too damn good for her. I wanted her to feel some pain so I beat her little lousy head in." The question of whether the defendant caused Karen Ann Roberts to suffer before she died was a jury question, and the evidence was sufficient to submit the issue. The mounting terror and horrible anticipation of a grisly fate intentionally inflicted by defendant on Karen Roberts as he pursued her over a distance of two and one-half blocks with what she knew was a heavy metal cudgel, together with his initial and repeated bludgeoning of her upper body and head[,] is sufficient beyond a reasonable doubt to constitute an offense "outrageously or wantonly vile, horrible or inhuman in that it involved torture" and satisfy the requirement of *Godfrey.* We find § 565.012.2(7) was validly applied in this case.

*State v. Smith,* 649 S.W.2d at 434.

We agree with this reasoning. At least on the record that was before the jury (petitioner claims that record should now be supplemented, as we shall see when we come to his motion to remand), the facts

stated by the Missouri Supreme Court were amply established. Of course there is no direct evidence of "mounting terror and horrible anticipation," but it is a fair inference from Smith's own account of the killing, properly received in evidence against him, that Karen Roberts felt just that. And even if, as petitioner now speculates, the first blow killed Ms. Roberts, as it could have, there is still the chase and the fear of pain and death it must have caused. This is not the rack, the thumbscrew, or the iron maiden, but we think it is within the ordinary meaning of "torture," and we hold that the jury's verdict was rational and supported by constitutionally sufficient evidence.

## IV.

We have held that all of the points urged by petitioner on appeal are without merit. In the ordinary case, the judgment would now be affirmed, and the matter would be concluded. But here, petitioner, represented by new counsel, a lawyer other than the one who tried this habeas case in the District Court, has made a motion to remand to the District Court for further proceedings. He wants to raise new arguments, factual and legal.

The motion to remand is 38 pages long and supported by 26 exhibits. Most of it is devoted to a factual argument designed to show, on the basis of evidence that was not before the jury at trial, that the verdict was incorrect, either because Smith did not kill Ms. Roberts, or because he did not deliberate or premeditate the killing, or because there was no chase of the victim, and therefore no foundation for the aggravating circumstance of torture. Perhaps the most striking item offered as newly discovered evidence is an affidavit of Timothy Smith, one of petitioner's brothers, dated June 23, 1987. The affidavit states, if read liberally, that petitioner did not kill Ms. Roberts, that he merely hit her one time, and that the killing was actually done by Eugene Smith, another brother, though, even on this version, with Gerald's consent and help.

We shall discuss in turn each of the major pieces of allegedly newly discovered evidence, including this affidavit, but before doing so we pause to place petitioner's contentions in their proper legal context. In the first place, it is important to understand that we are not triers of fact. Furthermore, the District Court, sitting in habeas corpus, is not a trier of fact, either, except as to facts related to federal constitutional contentions made by the petitioner. Questions of guilt or innocence, the degree of the crime, and the justification for the penalty under state law are all to be decided by the state trial court, subject to direct review on appeal. In a sense, then, innocence is irrelevant in a habeas case: the question is rather whether the conviction and sentence are consistent with the federal Constitution, and this question usually turns, in one form or another, on the fairness of the procedure used in the state courts. For an innocent person to be convicted, especially in a death case, is a terrible thing, but unless the federal Constitution has been violated, it is not the concern of the lower federal courts, except as the question may be relevant to the applicability of certain subsidiary aspects of habeas doctrine, such as the propriety of successive petitions. Newly discovered evidence of innocence is primarily the concern of the state courts, acting under their own rules of procedure, or of the Governor, in connection with applications for executive clemency. The Supreme Court has clearly held that "the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963). This Court has held that relief would be available if the petitioner can show that the newly discovered evidence " 'would probably produce an acquittal on retrial,' " *Dumond v. Lockhart,* 885 F.2d 419, 421 (8th Cir.1989), quoting *Mastrian v. McManus,* 554 F.2d 813, 823 (8th Cir.), *cert. denied,* 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977). But this exception to the general rule is a narrow one, coming into play only if the habeas court finds that the newly discovered

credible evidence would probably (in the sense of more likely than not) have produced a verdict of not guilty if the trial jury had heard it.

Moreover, the procedural context in which the new arguments are being asserted is important. They come not in a habeas corpus petition as originally filed, but in a motion to remand, the purpose of which is to allow petitioner, after the case gets back to the District Court, to amend his petition extensively and obtain an evidentiary hearing on a number of new issues. The motion to remand is the functional equivalent of a second or successive petition for habeas corpus. If a second petition making the new allegations asserted in the motion would be dismissed as an abuse of the writ, then the motion to remand should be denied. *Cf. Simmons v. Lockhart,* 856 F.2d 1144, 1146 (8th Cir.1988) (applying abuse-of-the-writ concepts to a motion to recall the mandate to allow new contentions to be raised, a first habeas petition having been denied on the merits).

■ Lest there be any doubt, we explicitly hold that the defense of abuse of the writ applies fully in death-penalty cases. In *Woodard v. Hutchins,* 464 U.S. 377, 104 S.Ct. 752, 78 L.Ed.2d 541 (1984) (per curiam), Justice Powell, speaking for a majority of the Court, said:

A pattern seems to be developing in capital cases of multiple review in which claims that could have been presented years ago are brought forward—often in a piecemeal fashion—only after the execution date is set or becomes imminent. Federal courts · should not continue to tolerate—even in capital cases—this type of abuse of the writ of habeas corpus.

*Id.* at 380, 104 S.Ct. at 753 (concurring opinion). The State of Missouri expresses the fear that this Court, in *Mercer v. Armontrout, supra,* 864 F.2d at 1432–33, has

declared the doctrine of abuse of the writ inapplicable in capital cases. *Mercer* does not say that, and that is not the law. The *Mercer* opinion simply observes that the natural desire to live, and the diligence of appointed counsel, understandably tend to produce last-minute appeals and petitions, and that federal courts should "take particular care in death penalty cases to give patient and thoughtful review of claims presented by petitioners through their appointed counsel," *id.* at 1433—sentiments which we again endorse today.

Our recent cases make fairly clear the outlines of the abuse-of-the-writ defense in this Circuit. (We speak now of petitions raising issues not raised in a previous federal habeas petition, as opposed to petitions raising issues that have been raised and decided adversely on the merits in a previous habeas petition.) When faced with a second or successive petition seeking to raise a ground not raised in a previous petition, a court should first determine why the ground was not raised earlier. (We assume, for purposes of this discussion, that the State has pleaded abuse of the writ as a defense (as it has here), in which case the burden is on petitioner to establish that the defense is without merit. See *Williams v. Lockhart,* 862 F.2d 155, 159 (8th Cir.1988).) If the ground was deliberately withheld, either by the client acting pro se or by the client's direction to counsel, then it would be an abuse of the writ to allow it to be raised in a subsequent petition. The statute that codifies the abuse-of-the-writ doctrine specifically mentions deliberate withholding as a ground for refusing to entertain a subsequent petition, 28 U.S.C. § 2244(b), and *Williams v. Lockhart, supra,* 862 F.2d at 159, restates this rule. This is probably the clearest instance of abuse of the writ, but it is not the only one.[8] See 28 U.S.C. § 2244(b), referring to

---

8. *Hall v. Lockhart,* 863 F.2d 609 (8th Cir.1988), states that abuse of the writ is "governed by the principles of deliberate bypass and inexcusable neglect." *Id.* at 610. The opinion was not intended to hold that there can be no abuse of the writ without a deliberate bypass of a claim by the petitioner. The particular theory of abuse of the writ urged by the respondent in *Hall*

turned on the petitioner's failure to have counsel press a certain claim in a previous habeas proceeding. It was in this context that the phrase "deliberate bypass and inexcusable neglect" was used. The *Hall* opinion does not mean that other circumstances—for example, a failure of counsel to press, without adequate

an applicant who "has ... on the earlier application deliberately withheld the newly asserted ground *or otherwise abused the writ."* (Emphasis ours.) For example, if a previous petition was filed by competent counsel and fully prosecuted, a petitioner cannot in a subsequent proceeding justify the making of new claims by claiming personal ignorance. Awareness of potential claims is chargeable to competent counsel and, therefore, to the petitioner. *Williams v. Lockhart, supra,* 862 F.2d 159, citing *Jones v. Estelle,* 722 F.2d 159, 167 (5th Cir.1983) (en banc), *cert. denied,* 466 U.S. 976, 104 S.Ct. 2356, 80 L.Ed.2d 829 (1984). Dismissal can be avoided if the earlier petition "was filed and litigated without [petitioner's] knowledge, participation, or authorization," *Williams,* 862 F.2d at 160, but that surely will be a rare case, and nothing of the sort is claimed here.

In discussing the omission of claims from a previous petition, in instances not involving a deliberate withholding, we have referred by analogy to the doctrine of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). This case and its descendants hold that a habeas court should not entertain a claim not properly preserved in the state courts unless (1) the petitioner can show "cause" sufficient to excuse the procedural default and "prejudice" resulting from it, or (2) the "constitutional violation [claimed] has probably resulted in the conviction of one who is actually innocent...." *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986). In *Harper v. Nix,* 867 F.2d 455, 457 (8th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 3194, 105 L.Ed.2d 702 (1989), we analyzed a claim of abuse of the writ in these terms. Certain claims had been set out in Harper's initial habeas petition, claims which appointed counsel later abandoned. Harper then sought to raise these claims in a subsequent petition. We held he failed to demonstrate sufficient "cause." Counsel, we said, had made a tactical decision to concentrate on what he thought was petitioner's strongest claim, and this "decision was neither unreason-

able nor inconsistent with competent legal representation." *Ibid.* No "external objective factors that prejudiced [the] defense" were suggested. *Ibid.* Therefore no cause sufficient to permit hearing the claims had been shown. Furthermore, the record did not show that the alleged error had probably caused the conviction of someone who was actually innocent. Accordingly, the "second petition for a writ of habeas corpus was properly dismissed for successive petitioning." *Id.* at 458. *Cf. Simmons v. Lockhart, supra,* 856 F.2d at 1146 (asking whether petitioner can show "a good enough reason why [an] issue was not presented" in his previous habeas petition.).

What emerges is a set of principles that are fairly clear. It would be a mistake to try to codify them as a rigid scheme of rules to be applied like a statute. But we think the governing principles can be summarized as follows, subject to reasoned elaboration over time in the decisional process: An attempt to raise claims omitted from a previous petition should be rejected as an abuse of the writ if (1) the previous omission was the deliberate choice of the petitioner, *or* (2) the previous omission is not excusable under the cause-prejudice-innocence approach of *Wainwright* and *Murray v. Carrier.* Obviously this analysis works only for claims that were available at the time of the previous petition. If the law has changed, or if facts have come to light that could not have been discovered earlier in the exercise of reasonable diligence, other considerations come into play.

Armed with this analytical framework, we now discuss the new issues petitioner wants to raise.

#### A.

■ The item of "new" evidence that most attracts one's attention, and the first such item put forward in the motion to remand, is the affidavit of Timothy Smith. The affidavit says that Timothy was at Eugene Smith's house on September 9, 1980. Petitioner came in and said he had just hurt Karen Roberts. They had been

cause, an argument in a previous petition—can-

not amount to abuse of the writ.

discussing what Karen had done to get treated for a venereal disease. She had jumped out of the car in which they were riding. Gerald tried to grab her, but she escaped, running towards railroad tracks. He chased her. She fell down, and, while getting up, picked up a piece of pipe and tried to hit Gerald. He took the pipe away from her and hit her one time. She fell down again and didn't move. Gerald panicked and ran to Eugene's house. Thereupon, according to the affidavit, Eugene left. He came back about 45 or 50 minutes later and said he had found Karen crawling up the tracks. He then told Gerald that there was "nothing to worry about—he [Eugene] took care of everything."

This story, designed to show that Gerald did not kill Ms. Roberts, is contained in an affidavit dated June 23, 1987. The affidavit was available to Mr. Bushmann, habeas counsel in the trial court, and he in fact referred to it briefly in a pleading, but then, under instructions from Gerald Smith himself, he did not further press the issue. In fact, Gerald himself wrote a letter to the District Court asking that the affidavit not be considered. Apparently Gerald told Mr. Bushmann that the affidavit was not true.

This is the clearest possible case of the deliberate withholding of a claim (assuming for present purposes that the affidavit would be the basis of a federal constitutional claim, which is a large question in itself). The affidavit was known to petitioner, and he instructed counsel not to use it. He also personally disclaimed the affidavit in a letter dated July 22, 1987, to Chief Judge Wright. To allow the use of the affidavit now would be to sanction a clear abuse of the writ.

Present counsel for petitioner responds, in essence, that petitioner suffers from borderline personality disorder, is impulsive and self-destructive, and should not be relied on in any respect. Nothing he says should be taken seriously, and it was "inappropriate and inexcusable," Motion to Remand 5, for previous counsel not to present the affidavit and explore the issues that it might raise.

We emphatically disagree, and at this point it is important to recall an aspect of the procedural history of this case. On several occasions during the proceedings, direct and collateral, for review of his conviction, Smith has announced that he does not want to pursue his remedies. An extensive hearing, complete with expert testimony on both sides, was held by the District Court on the issue of his competency to make this decision, and Smith was held competent, a finding which we affirmed. *Smith v. Armontrout*, 812 F.2d 1050 (8th Cir.), *cert. denied*, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 781 (1987). Thereafter, Smith changed his mind, and the District Court proceeded with his habeas petition, the petition that has given rise to the present appeal. After the District Court, on August 11, 1988, denied the petition, Mr. Bushmann filed a notice of appeal for Smith, but Smith himself disclaimed the appeal and asked us to dismiss it. Holding that no sufficient reasons existed to call in question the previous determination of competency, we complied with this request, and the appeal was dismissed. *Smith v. Armontrout*, 857 F.2d 1228 (8th Cir.1988) (per curiam). A group of next friends then filed a petition for rehearing, and the Court en banc denied it in a full opinion. We said, among other things:

> In sum, for the reasons stated, we hold that the new allegations of fact made by the next friends, even when supplemented by ... three new psychiatric affidavits, are not sufficient to raise a genuine issue of material fact requiring a new evidentiary hearing. The prior finding of competence therefore remains in effect.

*Smith v. Armontrout*, 865 F.2d 1502, 1506 (8th Cir.1988) (en banc). A stay of execution that had been previously entered to allow the Court to consider the petition for rehearing en banc was dissolved.

In taking this action, though, we noted the possibility that Smith might change his mind again. We directed the respondent Armontrout to deliver to Smith in person a copy of our opinion. And the author of the en banc opinion (who is also the present writer) stated his intention to stay the execution again if Smith should change his

mind about pursuing his remedies. *Id.* at 1507 n. 6. This in fact came to pass. A copy of our opinion was delivered to Smith, and he wrote the Clerk of this Court to express his desire to prosecute the remedies provided by law. The writer of this opinion, in an action joined by Judge John R. Gibson, then stayed the execution, observing that Smith's letter "vindicates the holding of the Court en banc that Mr. Smith knows what he is doing." *Smith v. Armontrout,* 865 F.2d 1515, 1516 (8th Cir. 1988). The Court en banc then reinstated the appeal and continued the stay thus granted. *Id.* at 1516–17.

Thus, this Court has itself consistently honored Gerald Smith's choices. It would be strange indeed if we were now to fault counsel for doing the same thing. We recognize that Smith's many changes of mind, to say nothing of the conduct that gave rise to this murder prosecution, show serious psychological instability. In dealing with this sort of thing the law is necessarily something of a blunt instrument. It is not practical to make fine gradations based upon the individual psychological profiles of each litigant. In general, courts treat people as either competent or not, and we have consistently treated Smith as *"sui juris."* *Smith v. Armontrout,* 865 F.2d 1514, 1515 (8th Cir.1988). It was entirely proper and reasonable for Mr. Bushmann to heed his client's instructions, especially since the client himself has now testified under oath, before the District Court, that he killed Ms. Roberts. The fact that Timothy Smith, who was interviewed by trial counsel before the trial in 1981, said nothing resembling the contents of his present affidavit, and the fact that Gerald Smith, through all of the conflicting stories that he told trial counsel, never said that his brother Eugene had done the killing, further strengthen our determination that the Timothy Smith affidavit furnishes no reason for further proceedings in this case.

The Motion to Remand offers a variety of other items of new evidence—new in the sense that they were not used in Smith's defense at the trial, nor cited to the District Court in support of his habeas petition. There is a letter to Dana Osia, who testified at the trial and corroborated the State's theory of the case. This letter, it is now argued, would have been exculpatory, because it is inconsistent with another letter, introduced against Smith at trial, threatening to kill Dana if she testified against him. The new letter, attached to the Motion as Exhibit 7, denies the truth of Smith's earlier statement to Ms. Osia that he had killed Ms. Roberts. Mr. Putzel says (Motion Exhibit 8) that he does not recall seeing the letter before.

The Motion to Remand never explicitly alleges how the new letter supports a federal constitutional attack on the conviction or sentence. The Motion concedes that "there is presently no evidence available from which to conclude that [any] documents were intentionally withheld by the prosecution." Motion 18. So the claim must be that Mr. Putzel was constitutionally ineffective in not using the letter, and that Mr. Bushmann was constitutionally ineffective in not attacking Mr. Putzel's conduct on this score. Such a claim, even if all procedural hurdles could be cleared, and even if both of the named lawyers had been seriously deficient in not making the argument in question—propositions of which we are not convinced—would still fail. Under *Strickland v. Washington, supra,* a successful claim of ineffective assistance of counsel must include a demonstration of prejudice. "The defendant must show that there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068. We are not persuaded that this standard has been met. Even if the letter had been admitted into evidence (there are hearsay problems with it, or at least with the self-serving exculpatory parts of it), it would hardly have helped Smith in the eyes of the jury. The letter, although denying that Smith himself was the killer, says "I know who did kill her.... I picked her up so this person could do it." The State had a strong case, including Smith's confession, his admissions to Ms. Osia, and his letter to

the *Globe–Democrat.* The jury was out only ten or fifteen minutes before returning a verdict of guilty. There is no appreciable chance that this letter would have made a difference. In addition, in view of Smith's admission under oath that he killed Ms. Roberts, an admission that the State would use against him if there were a new trial, there is simply no reason to doubt that the same result would be reached again.

The Motion lists other evidence: a forensic report showing Ms. Roberts had had intercourse shortly before her death; the absence of any injury to the victim's feet (a fact said to be inconsistent with the State's theory that the victim, whose body was found without shoes, was chased over 2½ blocks of rough terrain); an autopsy report showing marks on the body that are supposed to show that Ms. Roberts was struck from various angles; and the like. We have carefully considered these and other arguments made in the Motion. We have parsed the detailed factual inferences that counsel now urges. We are not persuaded that any or all of the material now brought forward would likely have made a difference, in the *Strickland* sense. After all is said and done, the fact remains that the best defense—diminished responsibility because of a mental disorder—was offered at trial. The jury rejected it. It was a jury issue.

### B.

The Motion to Remand also seeks to raise two legal arguments that were omitted from the habeas petition as filed and litigated in the District Court. The arguments revolve around Jury Instruction No. 25, which was patterned after Missouri Approved Instructions (MAI)—CR2d 15.44, and reads as follows:

If you decide that a sufficient aggravating circumstance or circumstances exist to warrant the imposition of death, as submitted in Instruction No. 22, it will then become your duty to determine whether a sufficient mitigating circumstance or circumstances exist which outweigh such aggravating circumstance or

circumstances so found to exist. In deciding that question you may consider all of the evidence relating to the murder of Karen Roberts.

You may also consider

1. Whether the murder of Karen Roberts was committed while the defendant was under the influence of extreme mental or emotional disturbance.

2. Whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

3. The age of the defendant at the time of the offense.

You may also consider whether the defendant had a mental disease or defect at the time of the murder of Karen Roberts.

You may also consider any circumstances which you find from the evidence in extenuation or mitigation of punishment.

If you unanimously decide that a sufficient mitigating circumstance or circumstances exist which outweigh the aggravating circumstance or circumstances found by you to exist, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Division of Corrections without eligibility for probation or parole until he has served a minimum of fifty years of his sentence.

■ The first argument is that the instruction fails to place the burden on the State to prove beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. Instead, the instruction puts the matter the other way round—it asks whether the mitigating circumstances outweigh the aggravating circumstances—and it does not say who has the burden of proof on this question. Assuming that all procedural hurdles can be surmounted, we see no constitutional error in the instruction, at least when read in the context of the instructions as a whole. Petitioner cites no cases in favor of his position, except for *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d

384 (1988), which we shall discuss shortly. The instruction tells the jury that if it finds that mitigating circumstances outweigh aggravating circumstances, it must return a verdict of life imprisonment, with eligibility for parole only after serving 50 years. It describes the findings that will compel a life sentence, as opposed to death, and it describes them accurately. It does not say that the verdict must be death if these findings are not made. On the contrary, Instruction No. 27 says the opposite. It tells the jury it does not have to return a verdict of death, whatever it thinks about the existence or weight of aggravating or mitigating circumstances. Even if the aggravating circumstances outweigh the mitigating, life imprisonment is still a permissible verdict. Nor do we think the failure to place the burden of proof on the State is constitutionally fatal. Whether certain circumstances outweigh others is not really a question of fact, not the kind of issue to which the concept of "burden of proof" can easily be applied. As the Supreme Court of Missouri said in *State v. Bolder*, 635 S.W.2d 673, 684 (Mo.1982) (en banc), *cert. denied*, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983), the issue involves "a more subjective process," one in which judgment, discretion, and moral sensibility play a large part.

Finally, petitioner claims Instruction No. 25 is inconsistent with *Mills v. Maryland*, *supra*, because it requires (or can be read to require) that the jurors must unanimously find the existence of a mitigating circumstance before they may weigh that circumstance in the sentencing balance. We do not reach the merits of this argument. Assuming there is no abuse of the writ, the point is still subject to a procedural bar under *Wainwright v. Sykes, supra*. No *Mills*-type objection to the instruction was made in the state courts. If it be suggested that the point is a novel one, which would amount to "cause" under *Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984), the *Mills* opinion itself stands as refutation. The case is written as a standard application of the rule that juries must be free to consider any and all evidence as a mitigating factor. This has

been a familiar feature of the legal landscape since 1978, when *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, was decided. The tools with which to make a *Mills* argument were available in 1981, when this case was tried. Even the dissenting Justices in *Mills* did not quarrel with the basic principles of the Court's opinion. Their position was rather that the particular instruction at issue did not in fact contain the unanimity requirement that the Court found objectionable. As the Motion to Remand suggests no cause for not raising the *Mills* point in the state courts, we deem it unnecessary to discuss the matter further, except to add that the point, though available in 1981, was not so obvious or so likely to succeed that trial counsel can now be charged with ineffective assistance for failing to raise it.

Even without a showing of cause and prejudice, it is still possible for a habeas court to reach the merits of a procedurally defaulted claim, if the federal constitutional error involved has probably resulted in the conviction of one who is actually innocent. *Murray v. Carrier, supra*. Here, the claim involved, that the instruction was contrary to the rule of *Mills*, relates solely to the appropriateness of the death penalty, not to the issue of guilt or innocence. But the *Murray* "innocence" exception should still be applied, in a proper case, by analogy. In the penalty-phase context, this exception will be available if the federal constitutional error alleged probably resulted in a verdict of death against one whom the jury would otherwise have sentenced to life imprisonment. The Motion to Remand does not argue, and we do not believe, that this is such a case. The question is this: if the jury had been told, in compliance with *Mills*, that any mitigating circumstance, even if not unanimously found by the jury, could be weighed, would it probably have fixed the punishment at life in prison? On this question the burden is on petitioner, and we think, on the basis of the whole trial transcript, that he has not carried it. The circumstances of the crime and the vengeful attitude shown by petitioner would still, in our judgment, have led to the

death penalty, even if the jury had been instructed in the terms petitioner now claims are required by *Mills*.

### V.

We have reviewed at length and with the seriousness this case deserves all of the arguments made in support of the appeal and the Motion to Remand. For the reasons given, we hold that they are without merit. The judgment of the District Court, dismissing the petition for habeas corpus, is affirmed. The Motion to Remand is denied. The stay of execution will remain in effect for the time being. But if no timely petition for rehearing is filed, or if one is filed and denied, it is our intention to dissolve the stay and issue our mandate. Thereafter, any further stay would have to be obtained from the Supreme Court or a Justice thereof.[9]

It is so ordered.

---

9. The Court is indebted to present counsel, Mr. Pleban, for his effective and zealous representa-   tion of his client.